UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| EDWARD LAY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-03738-JMS-MPB |
| | ) | |
| MARK SEVIER Warden, | ) | |
| | ) | |
| Respondent. | ) | |

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORUPUS**

Petitioner Edward Lay was convicted of two counts of murder and one count of attempted murder in an Indiana state court. Mr. Lay now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Mr. Lay alleges that there is insufficient evidence to support his convictions and that his trial and appellate counsel rendered ineffective assistance of counsel in several respects. However, the Indiana Court of Appeals reasonably applied federal law in Mr. Lay's direct and post-conviction appeals. Therefore, Mr. Lay's petition for a writ of habeas corpus is **denied**, and a certificate of appealability will not issue.

**I.**
**Background**

Federal habeas review requires the Court to "presume that the state court's factual determinations are correct unless the petitioner rebuts the presumption by clear and convincing evidence." *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018); *see* 28 U.S.C. § 2254(e)(1). On direct appeal, the Indiana Court of Appeals summarized the relevant facts as follows:

> In August 2011, Lay, estranged from his wife, was dating Mary Swift. Lay had
> recently moved into Mary's Fountain Square home in Indianapolis, in which Mary's

1

nine-year-old daughter Alley, Mary's twenty-year-old daughter Brittany Swift, Brittany's one-year-old son, and Brittany's boyfriend Joshua Edenfield also lived.

On the evening of Thursday, August 11, 2011, Lay's longtime friend Ron Kortz and his fiancee Kelly Jinks went to Mary's house to celebrate their new home and Ron's acceptance back into college. Ron and Kelly arrived around 8:00 p.m. with a bottle of Patron tequila. They went to Mary and Lay's bedroom, which was the normal place to "hang out." Brittany joined the party while Josh was at work. After the Patron tequila was gone, Lay and Ron went to a friend's house to get more tequila. After the second bottle of tequila was gone, Ron went with Josh, who had just returned home from work, to the liquor store and bought two bottles of Bambitos tequila. Josh did not drink any alcohol that night.

Sometime during the night, nine-year-old Alley was awakened by Lynyrd Skynyrd's "Sweet Home Alabama" coming from the bedroom. She went downstairs to complain because she had school in the morning. Mary and Brittany asked Lay to turn down the music, but he refused. An argument ensued, and Mary and Brittany told Lay to leave. Lay refused, calling Mary and Brittany "fuc*ing bit* *es," "who*es," and "cun*s" who "couldn't tell him what to do." A shoving match ensued between Mary and Brittany and Lay. As Mary and Brittany inched Lay out the door, he grabbed a black bag that was inside a box. At the time, no one knew what was inside the black bag.

The arguing continued in the kitchen and then spilled out onto the back porch, where Lay continued to yell that Mary and Brittany could not make him leave. Brittany responded that Lay was being "disrespectful" and "need[ed] to go for the night" but "c[ould] come back tomorrow." Lay responded, "Well I got my 40, bit**." Lay then backed down the ramp from the back porch toward the area where the cars were parked. Josh tried to calm Lay down; however, Lay put a gun to Josh's face and said something that Josh could not understand. Josh swatted the gun away, saying, "Hey, I'm not down here to fight." Lay turned around and went to the passenger side of Kelly's car, where Ron and Kelly tried to get him inside.

The situation did not diffuse; rather, it escalated. Lay began threatening Brittany, so she swung at him and missed. Lay then hit Brittany in the face four or five times, which prompted her mother Mary to join the melee. Ron pulled Brittany away and brought her to where Josh was standing at the bottom of the ramp. Josh tried to corral Mary and bring her back toward the house, but he failed. Josh managed to move Brittany farther up the ramp as Mary yelled at Lay and hit him in retribution for hitting her daughter.

As Josh turned back toward the cars, he heard three or four gunshots that happened "so fast" and then saw Lay running away. He also saw Ron asking Kelly if she had been hit. Brittany, however, saw Lay push Mary down to her hands and knees, point the gun at her from behind, and then she heard gun shots. Brittany did not see Lay pull the trigger because she fell through a loose board on the ramp. Brittany ran to

2

her mother. When Brittany realized her mother was not able to talk, she ran back to her sister, Alley, who was screaming on the back porch. Lay shot Mary, Kelly, and Ron. Josh called 911 to report the shootings.

Ron suffered a gunshot wound to his right shoulder. According to Ron, Lay shot him as he confronted Lay for shooting Kelly. Ron took a few steps and collapsed in the alley by Kelly. When Ron landed, he saw Mary on the ground near the car. Ron was taken to the hospital where he underwent surgery and was released a week later. He now has no feeling in his right arm and cannot hold a coffee cup in his right hand.

Mary and Kelly, however, suffered fatal wounds. Mary was dead when emergency personnel arrived. Mary suffered a gunshot wound to the top of her head. The bullet traveled downward and exited the right side of her forehead, lacerating her brain and fracturing her skull. Kelly was taken to the hospital but was pronounced dead a couple hours later. Kelly suffered a gunshot wound to her chest and left buttock. The gunshot wound to Kelly's chest perforated her diaphragm and lacerated her liver, causing blood accumulation in her right chest cavity. The other gunshot wound traveled across Kelly's pelvic cavity and landed in her right hip. Kelly died as a result of blood loss from both gunshot wounds.

The police apprehended Lay within a few blocks of the scene. Four spent shell casings were found at the scene.

*Lay v. State*, 986 N.E.2d 865, 2013 WL 1838514, *1–2 (Ind. Ct. App. Apr. 30, 2013) ("*Lay I*") (internal record citations omitted). Mr. Lay was convicted of two counts of murder and one count of attempted murder and sentenced to 140 years. *Id.* On direct appeal, he challenged the trial court's handling of a juror question, the sufficiency of the evidence to support his convictions, and the appropriateness of his sentence. *Id.* at *3–8. The Indiana Court of Appeals affirmed Mr. Lay's convictions and sentence, and the Indiana Supreme Court denied his petition for transfer. Dkt. 7-2 at 4.

Following his direct appeal, Mr. Lay filed a petition for post-conviction relief in state court. He asserted that both his trial and appellate counsel provided ineffective assistance of counsel in several respects. *Lay v. State*, 124 N.E.3d 648, 2019 WL 1721687 (Ind. Ct. App. Apr. 18, 2019) ("*Lay II*"). The trial court denied Mr. Lay's petition following a hearing, and the Indiana Court of

3

Appeals affirmed. *Id.* at *11. The Indiana Supreme Court denied Mr. Lay's petition to transfer. Dkt. 7-9 at 6.

Mr. Lay filed the instant petition for a writ of habeas corpus on September 3, 2019. He alleges (1) that the evidence was insufficient to support his convictions; (2) that the trial court violated his right to due process with how it handled a jury question; and (3) that trial and appellate counsel were ineffective in various respects. Dkt. 1.

## II.
## Applicable Law

A federal court may grant habeas relief only if the petitioner demonstrates that he is in custody "in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") directs how the Court must consider petitions for habeas relief under § 2254. "In considering habeas corpus petitions challenging state court convictions, [the Court's] review is governed (and greatly limited) by AEDPA." *Dassey v. Dittmann*, 877 F.3d 297, 301 (7th Cir. 2017) (en banc) (citation and quotation marks omitted). "The standards in 28 U.S.C. § 2254(d) were designed to prevent federal habeas retrials and to ensure that state-court convictions are given effect to the extent possible under law." *Id.* (citation and quotation marks omitted).

A federal habeas court cannot grant relief unless the state court's adjudication of a federal claim on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"The decision federal courts look to is the last reasoned state-court decision to decide the merits of the case, even if the state's supreme court then denied discretionary review." *Dassey*, 877 F.3d at 302. "Deciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims, and to give appropriate deference to that decision[.]" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191–92 (2018) (citation and quotation marks omitted). "This is a straightforward inquiry when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion." *Id.* "In that case, a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id.*

"For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102. "The issue is not whether federal judges agree with the state court decision or even whether the state court decision was correct. The issue is whether the decision was unreasonably wrong under an objective standard." *Dassey*, 877 F.3d at 302. "Put another way, [the Court] ask[s] whether the state court decision 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Richter*, 562 U.S. at 103).

## III.
## Discussion

Mr. Lay's claims in his habeas petition fall into three categories: (1) whether there was sufficient evidence to sustain his convictions; (2) whether the trial court violated his right to due process; and (3) whether he received ineffective assistance of counsel. The last state-court adjudication on the merits for the first two issues was the Indiana Court of Appeals's unpublished opinion on direct appeal, *Lay I*, 2013 WL 1838514, and for the last issue, the Indiana Court of Appeals's unpublished opinion on post-conviction review, *Lay II*, 2019 WL 1721687.

### A. Sufficiency of the Evidence

The Supreme Court provided the standard for sufficiency of the evidence claims in habeas petitions in *Jackson v. Virginia*, 443 U.S. 307 (1979). In that case, the Court explained that evidence is sufficient to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis original). "[H]abeas reviews of *Jackson* claims are subject to two levels of judicial deference creating a high bar: first, the state appellate court determines whether any rational trier of fact could have found the evidence sufficient; second, a federal court may only overturn the appellate court's finding of sufficient evidence if it was objectively unreasonable." *Saxon v. Lashbrook*, 873 F.3d 982, 987–88 (7th Cir. 2017). "Federal review of these claims . . . turns on whether the state court provided fair process and engaged in reasoned, good-faith decisionmaking when applying *Jackson*'s 'no rational trier of fact' test." *Gomez v. Acevedo*, 106 F.3d 192, 199 (7th Cir. 1999).

Mr. Lay raises two issues challenging the sufficiency of the evidence. First, he alleges the State did not prove that Mr. Lay intended to kill Kelly. Second, he alleges that the State produced insufficient evidence to rebut his claim of self-defense. In addressing his challenges to the

6

sufficiency of the evidence, the Indiana Court of Appeals correctly articulated the *Jackson* standard. *Lay I*, 2013 WL 1838514, at *5.

The court found that there was sufficient evidence to support Mr. Lay's conviction for murdering Kelly under the doctrine of transferred intent. "Under the doctrine of transferred intent, a defendant's intent to kill one person is transferred when, by mistake or inadvertence, the defendant kills a third person; the defendant may be found guilty of the murder of the person who was killed, even though the defendant intended to kill another." *Id.* (internal citations omitted). The court summarized the evidence that supported the conviction as follows:

> Here, the evidence shows that Lay had a heated and ongoing confrontation with Mary and Brittany. The three of them argued inside the house, where they were shoving one another. The argument then spilled outside, where Lay hit Brittany. This upset Mary, who joined the ruckus. Ron was able to pull Brittany away and pass her off to Josh. Brittany then saw Lay push Mary down to her hands and knees, point the gun at her from behind, and then she heard gun shots. Josh, the only sober person of the group, heard three or four gunshots happen "so fast" that he could not tell if there were pauses in between. He then saw Ron ask Kelly if she had been hit. When Ron confronted Lay for shooting Kelly, Lay shot Ron in the shoulder. In the end, Mary was shot in the head. Kelly was shot twice—in the chest and left buttock. And Ron was shot in the shoulder. Four spent shell casings were found at the scene.

*Id.* at *6. The court then concluded that from "this evidence, the jury could infer that Lay shot at or through Mary or Ron and the bullets struck Kelly, a mere bystander, causing her fatal injuries. Accordingly, the evidence is sufficient to support Lay's conviction for the murder of Kelly based on the doctrine of transferred intent." *Id.* This was a reasonable application of *Jackson*.

Mr. Lay's argument highlights discrepancies amongst the witnesses' testimony. Dkt. 1-1. And because all of the witnesses were intoxicated except for Josh, there were plenty of discrepancies. For example, Ron testified that Mr. Lay was in the passenger seat of the car with the door closed, ready to leave, when Mary opened the door and started punching him repeatedly shortly before Ron heard gunshots. Tr. 65–67. Brittany—who others testified was the drunkest of

7

the group—testified she saw Mr. Lay push Mary to her hands and knees shortly before hearing gunshots. Tr. 78, 165–67. But it is the "responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Thus, once a defendant is convicted, "the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Id.* (emphasis original). The Indiana Court of Appeals properly considered all of the evidence—not placing more import on one witness's testimony over another's—when it concluded there was sufficient evidence to convict Mr. Lay of Kelly's murder.

Mr. Lay next alleges that the State failed to introduce sufficient evidence to rebut his claim of self-defense. In Indiana, "[i]n order to prevail on a claim of self-defense, a defendant must show: (1) he was in a place where he had a right to be; (2) he acted without fault; and (3) he had a reasonable fear of death or great bodily harm." *Lay I,* 2013 WL 1838514, at *6 (internal citation omitted). The court found that the State rebutted the second and third elements. *Id.* at *7. This was a reasonable application of *Jackson*. Mr. Lay started the confrontation when he refused to turn down the radio. He at times refused to leave the house and pointed a gun at Josh's face when Josh asked him to leave. There was no evidence he was in fear of great bodily harm—no one else besides him had a gun. Rather, there was mutual shoving and hitting amongst Mr. Lay, Mary, and Brittany that resulted in Mr. Lay shooting three people, killing two. Accordingly, the evidence was sufficient to rebut Mr. Lay's self-defense claim.

Mr. Lay's sufficiency of the evidence arguments are without merit, and he is entitled to no relief on these claims.

**B. Juror Question**

As the jurors deliberated, they submitted a note to the court asking, "If we are unclear as to the defendant's intention, does transferred intent apply?" Tr. 387–88. The court decided to give the parties five minutes to respond to the jury's question—a proposal to which the defendant agreed. *Id.* at 388. The court then brought the jurors back to the courtroom and encouraged them to reread the instructions. *Id.* at 389. The parties briefly argued transferred intent as it related to Kelly. *Id.* at 389–93. The jury deliberated for four more hours before finding Mr. Lay guilty on all three counts. *Id.* at 394, 396.

Mr. Lay argues that this procedure violated his right to due process. The respondent argues this claim is procedurally defaulted.

"Procedural defaults take several forms, but two are paradigmatic." *Richardson v. Lane*, 745 F.3d 258, 268 (7th Cir. 2014). The first occurs when a petitioner fails to "fairly present his federal claim to the state courts so that they have a 'fair opportunity' to consider and, if needed, correct the constitutional problem." *Schmidt v. Foster*, 911 F.3d 469, 486 (7th Cir. 2018) (en banc). The second, invoked by the respondent here, occurs when "the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Walker v. Martin*, 562 U.S. 307, 315 (2011) (citation and internal quotation marks omitted). "[W]hen a state court refuses to reach the merits of a petitioner's federal claims because they were not raised in accord with the state's procedural rules (i.e., because the petitioner failed to contemporaneously object), that decision rests on independent and adequate state procedural grounds." *Kaczmarek v. Rednour*, 627 F.3d 586, 591 (7th Cir. 2010).

The Indiana Court of Appeals ruled that there was no error because, pursuant to a state jury rule, the trial court has considerable discretion in how to resolve jury questions, including by

9

allowing supplemental argument by the parties. *Lay I,* 2013 WL 1838514, at \*5. However, even if this method was problematic, the court further determined that Mr. Lay invited the error by consenting to the proposal. *Id.* Under Indiana's invited-error doctrine, "'A party may not invite error, then later argue that the error supports reversal, because error invited by the complaining party is not reversible error.'" *Id.* (quoting *Booher v. State*, 773 N.E.2d 814, 822 (Ind. 2002)). The invited-error doctrine is an independent and adequate ground for rejecting Mr. Lay's challenge to the handling of the juror question. *Richardson v. Griffin*, 866 F. 3d 836, 842 (7th Cir. 2017); *Coleman v. O'Leary*, 845 F.2d 696, 701 (7th Cir. 1988) (holding invited-error doctrine is independent and adequate state ground). Mr. Lay does not argue any basis to excuse the default. Accordingly, habeas relief is unavailable to Mr. Lay for this claim because it is procedurally defaulted.

### C. Ineffective Assistance of Counsel

Mr. Lay next asserts claims of ineffective assistance of trial and appellate counsel. A criminal defendant has a right under the Sixth Amendment to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). For a petitioner to establish that "counsel's assistance was so defective as to require reversal," he must make two showings: (1) that counsel rendered deficient performance that (2) prejudiced the petitioner. *Id.* "This inquiry into a lawyer's performance and its effects turns on the facts of the particular case, which must be viewed as of the time of counsel's conduct." *Laux v. Zatecky*, 890 F.3d 666, 673–74 (7th Cir. 2018) (citation and quotation marks omitted). "As for the performance prong, because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight, *Strickland* directs courts to adopt a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 674 (citation and quotation marks omitted).

"The prejudice prong requires the defendant or petitioner to 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). On post-conviction review, the Indiana Court of Appeals correctly articulated the *Strickland* standard. *Lay II*, 2019 WL 1721687, at *4.

### i.   Jury Instructions

Mr. Lay alleges his trial counsel was ineffective for failing to object to final jury instructions 30 and 31, and that his appellate counsel was ineffective for failing to raise the issue on appeal.

Instruction 30 stated:

The defendant is charged with murder a felony. Voluntary manslaughter a Class A felony, is included in Count I, murder a felony. *If the State proves the defendant guilty of murder a felony, you need not consider the included crime.* However, if the State fails to prove the defendant committed murder a felony, you may consider whether the defendant committed voluntary manslaughter a Class A felony, which the court will define for you.

You must not find the defendant guilty of more than one crime for each count.

Dkt. 8-1 at 214 (emphasis added).

Instruction 31 stated:

The crime of murder is defined by law as follows:

A person who knowingly or intentionally kills another human being, commits murder, a felony. Included in the charge in this case is the crime of voluntary manslaughter, which is defined by the law as follows: A person who knowingly or intentionally kills another human being while acting under sudden heat commits voluntary manslaughter, a Class B felony. The offense is a Class A felony if it is committed by means of a deadly weapon.

Sudden heat is a mitigating factor that reduces what otherwise would be murder to voluntary manslaughter. The State has the burden of proving beyond a reasonable doubt that the defendant was not acting under sudden heat.

Before you may convict the defendant, the State must have proved each of the following beyond a reasonable doubt:

1. The defendant, Edward L. Lay
2. knowingly or intentionally
3. killed
4. another human being, namely: Mary Swift, by shooting a deadly weapon, that is: a gun, at and against the person of Mary Swift, thereby inflicting mortal injuries upon Mary Swift, causing Mary Swift to die
5. and the defendant was not acting under sudden heat
6. and the defendant killed by means of a deadly weapon.

If the State failed to prove each of these elements 1 through 4 beyond a reasonable doubt, you must find the defendant not guilty of murder as charged in Count I.

If the State did prove each of these elements 1 through 4 and element 6 beyond a reasonable doubt, but the State failed to prove beyond a reasonable doubt element 5, you may find the defendant guilty of voluntary manslaughter, a Class A felony, a lesser included offense of Count I.

If the State did prove each of these elements 1 through 5 beyond a reasonable doubt, you may find the defendant guilty of murder, a felony as charged in Count I.

Dkt. 8-1 at 215–16.

Mr. Lay alleges that Jury Instruction 30 created a sequencing error that precluded the jury from considering voluntary manslaughter. This is because under Indiana law, murder and voluntary manslaughter contain the same elements: a knowing or intentional killing of another person. *See* Ind. Code § 35-42-1-1(1) (murder) and Ind. Code § 35-42-1-3 (voluntary manslaughter). Voluntary manslaughter is a lesser included offense of murder, but it is not a "typical" lesser included offense, because instead of requiring the State to prove less than all the elements of murder, it requires the State to prove all of the elements of murder *and* disprove the existence of sudden heat when there is any appreciable evidence of such in the record. *Watts v. State*, 885 N.E.2d 1228, 1232 (Ind. 2008). Thus, Jury Instruction 30 was problematic, Mr. Lay argues, because if the jury was told they need not consider the lesser included crimes if they found the State proved the elements of murder, then they might not have continued to evaluate whether the State had disproven the existence of sudden heat. Mr. Lay contends that Jury Instruction 31

was problematic because it incorrectly lists "sudden heat" as an element of voluntary manslaughter when it is actually a mitigating factor that reduces what otherwise would be murder to voluntary manslaughter. He alleges that although elsewhere in the instruction "sudden heat" is identified as a mitigating factor, the error of additionally identifying it as an element—when combined with the sequencing error in final instruction 30—prevented the jury from properly considering voluntary manslaughter. Both Mr. Lay's trial attorney and appellate attorney acknowledged that these jury instructions were incorrect and that they should have objected to them. PCR Tr. 13, 22, 26–27.

Mr. Lay relies on two cases in which the Indiana Court of Appeals found ineffective assistance of counsel for failure to object to erroneous instructions dealing with the interplay between murder and voluntary manslaughter. In *Roberson v. State*, 982 N.E.2d 452, 458 (Ind. Ct. App. 2013), one of the instructions suffered from the same sequencing issue, stating in part, "If the State proves the Defendant guilty of Murder, you *need* not consider the included crimes." Worse for Roberson, however, when the trial court read the instruction into the record, it replaced the word "need" with "must." *Id.* Another instruction erroneously informed the jury twice that the State had the burden of *proving* sudden heat in order for the jury to convict Roberson of voluntary manslaughter. *Id.* The court found that given the "erroneous, internally inconsistent, and inherently contradictory language" in the instructions and the considerable evidence of sudden heat, Roberson was prejudiced by counsel's failure to object. *Id.* at 458, 461. In the second case, *McWhorter v. State*, 970 N.E.2d 770 (Ind. Ct. App. 2012), *trans. granted, summarily aff'd in relevant part*, 993 N.E. 2d 1141 (Ind. 2013), the Indiana Court of Appeals also found ineffective assistance of counsel. There, one instruction informed the jury that if the State failed to prove the elements of murder, the jury must find the defendant not guilty of murder, but immediately proceeded to say, "You may then consider any included crime." *Id.* at 777. The court found the instruction "invited

inconsistency and renders the result of the trial unreliable" given that intent was the only issue in dispute. *Id.* at 778.

On review from denial of Mr. Lay's post-conviction petition, the Indiana Court of Appeals assumed trial counsel's failure to object constituted deficient performance but concluded that Mr. Lay failed to prove he was prejudiced by the mistake. *Lay II*, 2019 WL 1721687, at *5–6. The court reasoned that the instructions taken as a whole properly instructed the jury on the difference between voluntary manslaughter and murder. *Id.* at *7. Unlike in *Roberson*, the jury was not instructed that it *must* not consider the lesser included crimes—thereby prohibiting consideration of voluntary manslaughter—only that it *need not*. *Id.* Further, the court properly instructed the jury that the State bore the burden of disproving the existence of sudden heat beyond a reasonable doubt. *Cf. Sanders v. Cotton*, 398 F.3d 572, 583 (7th Cir. 2005) (granting habeas relief where jury was never instructed that the State bore burden of disproving sudden heat). Finally, unlike in *Roberson*, where neither party explained the proper burden of proof with respect to sudden heat during closing argument, the "deputy prosecutor explained that the State had to disprove sudden heat." *Lay II*, 2019 WL 1721687, at *7.

The court also distinguished *McWhorter*, finding that here the jury was properly instructed, albeit "in an inartful manner," that if the State proved Mr. Lay knowingly or intentionally killed Mary, it had to consider whether the State had disproven sudden heat. *Id.*

The court concluded,

> Considering the totality of the final jury instructions, and trial counsel's closing argument, we cannot say that Lay showed a reasonable probability that, but for trial counsel's errors, the result of the trial would have been different. Generally, errors in the giving or refusing of instructions are harmless where a conviction is clearly sustained by the evidence and the jury could not properly have found otherwise.

*Id.* (internal citations and quotation marks omitted).

14

Although the Court disagrees with aspects of the appellate court's analysis, the appellate court's ultimate conclusion that Mr. Lay did not prove he was prejudiced was a reasonable application of *Strickland*.

The Court parts ways with the Indiana Court of Appeals in two respects. First, the Court finds that the prosecutor's statements during closing argument likely injected more confusion into the jurors' minds about the difference between murder and voluntary manslaughter. The deputy prosecutor said,

> It is not sudden heat. *There's your definition of sudden heat, ladies and gentlemen. If I disprove one of them it's gone. All I have to do is knock one out. Look at the list.*[1] Prevents deliberation or premeditation. No way. Premeditation, I got my gun bitch. Pulling the gun on Josh. …
>
> Anger. Yes, he was angry, okay? …It's got to be something more. It's got to be sudden. … It's got to be something that overcomes you in the moment. We don't have that because he was already itching for an excuse to use his bullets.
>
> Deliberation and premeditate. He had a mindset that night. He had a mindset. It might not have been I'm going to do some killing, but he had a feeling.

Tr. 354–55 (emphasis added). The jury received the following instruction defining "sudden heat":

> The term "sudden heat" means an excited mind. It is a condition that may be created by strong emotion such as anger, rage, sudden resentment or jealousy. It may be strong enough to obscure the reason of an ordinary person and prevent deliberation and meditation. It can render a person incapable of rational thought.

Dkt. 8-1 at 227. Thus, although the State acknowledged that it had the burden of disproving sudden heat, it also gave the jury the incorrect impression that there were elements, such as anger, or lack of premeditation, to sudden heat and that by "knock[ing] one out," it met its burden. The prosecutor's misrepresentation of the definition of sudden heat is not on its own a constitutional error—the jury was instructed both on the definition of sudden heat and that arguments by counsel

---

[1] The deputy prosecutor had used Power Point slideshows during the trial, *see e.g.* tr. 15, and was presumably referring to a Power Point slide here.

are not evidence. *Id.* at 227, 229. But the appellate court was wrong to conclude that the prosecutor's statements cured any confusion about what differentiated voluntary manslaughter and murder.

The Court's second misgiving is the appellate court's conclusion that Mr. Lay failed to show prejudice because erroneous instructions are generally considered "harmless where a conviction is clearly sustained by the evidence and the jury could not properly have found otherwise." *Lay II*, 2019 WL 1721687, at *8. The Indiana Court of Appeals did not address the appreciable evidence of sudden heat in its analysis. But as in *Roberson*, "[t]he evidence of sudden heat in this case was not inconsiderable." *Roberson*, 982 N.E.2d at 461. Mr. Lay did not dispute being the shooter—the only issue was his intent and whether he acted in self-defense. The shooting occurred during a melee amongst three drunk adults. Although the witnesses disagreed about the timing of the shots, they agreed that the shooting happened suddenly while the parties were arguing. The jury deliberated for many hours and, as discussed above, submitted a question manifesting confusion on intent.

However, to demonstrate that the Indiana Court of Appeals unreasonably applied *Strickland*'s prejudice prong, Mr. Lay "must show far more than that the state court's decision was 'merely wrong' or 'even clear error.'" *Shinn v. Kayer*, 592 U.S. ___ (2020) (*per curiam*) (slip op. at 7) (quoting *Virginia v. LeBlanc*, 582 U.S. ___, ___ (2017) (*per curiam*) (slip op., at 3)). Rather, he "must show that the state court's decision is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Richter*, 562 U.S. at 103).

A fairminded jurist could conclude that trial counsel's failure to object to final instructions 30 and 31 did not prejudice Mr. Lay. "It is well-established that 'a single instruction to the jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'"

16

*Benefiel v. Davis*, 357 F.3d 655, 662 (7th Cir. 2004) (quoting *Boyd v. United States*, 271 U.S. 104, 107 (1926) and citing *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973)). The Court agrees with the Indiana Court of Appeals  that the instructions as a whole conveyed to the jury that murder and voluntary manslaughter share the same elements, and that the State had the burden of disproving beyond a reasonable doubt that Mr. Lay did not act in sudden heat in order to convict him of murder rather than voluntary manslaughter. Accordingly, Mr. Lay is not entitled to relief on this ineffective assistance of trial counsel claim.

The Indiana Court of Appeals further found that appellate counsel was not ineffective for failing to challenge the faulty instructions as fundamental error on direct appeal. *Lay II*, 2019 WL 1721687, at *10–11. Fundamental error is a state law principle. *Lee v. Davis*, 328 F.3d 896, 901–02 (7th Cir. 2003). The Indiana Court of Appeals noted that the bar establishing fundamental error is higher than the that for *Strickland* prejudice, so a finding that trial counsel's deficient performance was not prejudicial necessarily precluded a finding of fundamental error, and subsequently ineffective assistance of appellate counsel for failing to raise the issue as fundamental error. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Wilson v. Corcoran*, 526 U.S. 1, 5 (2010) (citation and quotation marks omitted); *see also Miller v. Zatecky*, 820 F.3d 275, 277 (7th Cir. 2016) ("A federal court cannot disagree with a state court's resolution of an issue of state law."). Because the determination that proving fundamental error is a higher burden than proving ineffective assistance rests in state law, this Court will not review it.

### ii. Failure to Request Voluntary Manslaughter Instruction

Mr. Lay next alleges that trial counsel was ineffective for failing to request a voluntary manslaughter instruction for Kelly Jinks after obtaining one for Mary Swift, and appellate counsel

was ineffective for failing to raise this issue on appeal. Although Mr. Lay raised this issue in his post-conviction relief petition and on direct appeal, he did not raise it in his petition to transfer to the Indiana Supreme Court. Dkt. 7-14.

If a petitioner raises a claim in a § 2254 petition without first presenting it through "one complete round of the State's established appellate review process," the claim is procedurally defaulted. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also Hicks v. Hepp*, 871 F.3d 513, 530−31 (7th Cir. 2017). Mr. Lay's failure to raise the claim in his petition to transfer means the claim is procedurally defaulted. *Hinesley v. Knight*, 837 F.3d 721, 735−36 (7th Cir. 2016) (Indiana petitioner's ineffective assistance of counsel claim procedurally defaulted, despite full and fair presentment in the Indiana Court of Appeals, because petitioner mentioned *Strickland* only "in passing" in his petition to transfer to the Indiana Supreme Court).

Mr. Lay could avoid the procedural default by showing either "cause and prejudice" to excuse the default or "that the court's failure to consider the defaulted claim would result in a fundamental miscarriage of justice." *McDowell v. Lemke*, 737 F.3d 476, 483 (7th Cir. 2013). But he has alleged neither, and neither is apparent from the record.

### iii. Failure to Call Expert Witness

Finally, Mr. Lay alleges trial counsel was ineffective for failing to call an expert witness to rebut the testimony of the State's pathologist Dr. Obenson. At trial, Dr. Obenson testified that the wound in the back of Mary's head was the entrance wound. Tr. 215. Mr. Lay alleges that this testimony undermined his defense, as it supported Brittany's testimony that he shot Mary in the back of the head and negated his self-defense and sudden heat claims.

At the post-conviction hearing, Mr. Lay called Dr. George Nichols, the chief medical examiner of Kentucky for over 20 years who has worked as a consultant after retirement.

PCR Tr. 34, 43. Dr. Nichols testified that the autopsy described "external beveling" in the parietal bone near the wound on the back of her head, but "external beveling means that that wound is a wound of exit, not a wound of entry." *Id.* at 41. Dr. Nichols examined the autopsy report and two pictures showing Mary's external skin wounds. *Id.* at 44. The pictures did not aid in his analysis of whether the wound was an entrance or exit wound, as skin wounds are "nonspecific." *Id.* at 46–47. Rather, his conclusion rested solely on the description of the beveling. *Id.* at 47. He further testified that his opinion regarding the wound path would change if the word "external" in the autopsy report was a typographical error. *Id.* at 45.

Trial counsel testified that Mr. Lay told her that he did not shoot Mary in the back of the head, and "it would have been helpful" to challenge the location of the entry wound. *Id.* at 15. She further testified that she did not request funds to get an expert, but if she did and her expert gave a different opinion, she would have called the expert as a witness. *Id.* at 18. However, she also testified that she had no reason to doubt the state pathologist's conclusion about the location of the entrance wound, other than Mr. Lay's counter-narrative. *Id.*

The Indiana Court of Appeals held that trial counsel's performance was not deficient, finding that Dr. Obenson's testimony about the wound path did not invalidate Mr. Lay's self-defense claim, and "trial counsel's cross-examination of Dr. Obenson downplayed the significance of the wound path." *Lay II*, 2019 WL 1721687, at *10.

This was a reasonable application of federal law. Certainly, failure to investigate and call an independent medical expert to counter the state medical expert's opinion can constitute deficient performance. *See Dunn v. Jess*, --- F. 3d ---, 2020 WL 6883423, at *7–8 (7th Cir. Nov. 24, 2020) (finding that trial counsel performed deficiently by failing to review exculpatory medical reports and failing to call a forensic pathologist with whom he had conferred to challenge the state medical

19

examiner's theory of the victim's death). However, the fact that the State calls an expert witness does not obligate defense counsel to call an independent expert. *Richter*, 562 U.S. at 111. "In many instances cross-examination will be sufficient to expose defects in an expert's presentation . . . [W]hile it is possible an isolated error can constitute ineffective assistance if it is sufficiently egregious, it is difficult to establish ineffective assistance where counsel's overall performance reflects active and capable advocacy." *Id.* Trial counsel's cross-examination of Dr. Obenson was skillful and downplayed the import of the location of the entrance wound. On cross-examination, Dr. Obenson testified that he could not say whether Mary's body or head was turning away or leaning down, or whether she was standing, sitting, or kneeling. Tr. 238. Trial counsel also elicited testimony from Dr. Obenson that Mary was not small in stature, that she was not tested for her bipolar medication, and that her blood alcohol level was over three times the legal limit. *Id.* at 237−39. In light of her effective cross-examination, trial counsel's decision not to call an expert witness was not deficient.[2] *Richter*, 562 U.S. at 111. This is especially so where Dr. Nichols's opinion was based on limited information and did not decisively rebut Dr. Obsenson's opinion. Mr. Lay is not entitled to relief on this claim.

## IV.
## Certificate of Appealability

"A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017). Instead, a state prisoner must first obtain a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing

---

[2] Because the Court agrees with the Indiana Court of Appeals that trial counsel did not perform deficiently, it need not analyze the cumulative impact of her decision not to call an independent expert with the instruction-related errors. *Sussman v. Jenkins*, 636 F.3d 329, 360-61 (7th Cir. 2011) (explaining that when faced with multiple errors by counsel, the Court "must consider the[ir] cumulative impact" to determine prejudice).

of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In deciding whether a certificate of appealability should issue, "the only question is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck*, 137 S. Ct. at 773 (citation and quotation marks omitted).

Rule 11(a) of the Rules Governing Section 2254 Proceedings in the United States District Courts requires the district court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." No jurist of reason could disagree that the Indiana Court of Appeals reasonably applied federal law when it analyzed Mr. Lay's sufficiency of the evidence arguments on direct appeal and his ineffective assistance of counsel claims on post-conviction review. Further, no jurist would disagree that one of Mr. Lay's ineffective assistance allegations was procedurally defaulted. Therefore, a certificate of appealability is **denied**.

## V.
## Conclusion

Mr. Lay's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **denied**, and a certificate of appealability shall not issue.

Final Judgment in accordance with this decision shall issue.

**IT IS SO ORDERED.**

Date: 12/21/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

EDWARD LAY
144286
NEW CASTLE – CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362

Jesse R. Drum
INDIANA ATTORNEY GENERAL
jesse.drum@atg.in.gov